Filed 6/23/25  P. v. Mix CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>ROBERT MIX,<br><br>     Defendant and Appellant. | D083066<br><br><br>(Super. Ct. No. FELSS1003876) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Lorenzo R. Balderrama and Kawika Smith, Judges.  Affirmed.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

The Sexually Violent Predator Act (SVPA) (Welf. & Inst. Code,[1] § 6600 et seq.) "authorizes the involuntary commitment of certain convicted sex offenders—termed 'sexually violent predators,' or SVPs—who are found to have mental disorders that make them likely to reoffend after release from prison." (*Camacho v. Superior Court* (2023) 15 Cal.5th 354, 367 (*Camacho*).) Here, the district attorney petitioned to commit Robert Mix under the SVPA following his conviction for committing a sexual offense against a child. A jury eventually found that Mix qualified as an SVP, and the trial court committed him to the State Department of State Hospitals for an indefinite term.

Mix appeals the commitment order, contending the trial court erred in denying his motion to dismiss the petition based on a violation of his constitutional right to a timely trial. He further argues the judge who heard the motion to dismiss should have recused himself because it was alleged that he contributed to the pretrial delay. Lastly, Mix claims the court erred in denying four of his *Marsden*[2] motions to replace his appointed counsel.

Although the pretrial delay in this case was substantial—almost nine years from the petition to the motion to dismiss, and another four years to trial—we conclude the trial court did not abuse its discretion in denying the motion to dismiss, as the defense was primarily responsible for the delays. Indeed, Mix executed written waivers of his right to a timely trial that account for more than half of the pretrial delay. We further conclude that Mix has failed to preserve his recusal argument for appeal, and that the

---

[1]    Further undesignated statutory references are to the Welfare and Institutions Code.

[2]    *People v. Marsden* (1970) 2 Cal.3d 118.

2

court properly denied his *Marsden* motions. Accordingly, we affirm the commitment order.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1998, Mix was convicted of assault with intent to commit criminal sexual conduct in Michigan. Ten years later, he pleaded guilty to committing a lewd act with a child under age 14 (Pen. Code, § 288, subd. (a)) in this state. For the latter offense, he was sentenced to three years in prison with credit for time served. He was released on parole, and then violated parole by associating with sex offenders and using marijuana. He was ordered to return to prison for nine months.

### A. *Initial Proceedings*

Before his scheduled release from prison, the Department of Corrections and Rehabilitation referred Mix to the Department of Mental Health (DSH[3]) for an evaluation. Based on record review, risk assessment, and clinical examination by two psychologists—Drs. Douglas R. Korpi and Erik L. Fox—DSH recommended that the San Bernardino District Attorney petition to civilly commit Mix under the SVPA. On September 14, 2010, the San Bernardino District Attorney filed a petition to commit Mix as an SVP for an indefinite term.

Upon receiving the petition, the trial court (Judge Katrina West) set a probable cause hearing for September 17, 2010. On that date, Deputy District Attorney (DDA) Maureen O'Connell and Deputy Public Defender (DPD) Chris Williams appeared before the court. The public defender was appointed to represent Mix. Williams accepted the court's appointment,

---

[3]    The Department of Mental Health is now known as the State Department of State Hospitals. For clarity, we use the current acronym, "DSH."

denied all allegations in the petition, and requested a one-week continuance to allow him time to confer with Mix. The court granted the request and set a status conference for September 24, 2010. Williams stated that Mix preferred not to be present at the next hearing, and waived his presence. To align the schedules of the court and the expert witnesses, the probable cause hearing was continued to February 7 and 8, 2011.

DPD Pamela King took over Mix's case shortly before the probable cause hearing. Following the hearing, at which Mix was personally present, the trial court (Judge Harold T. Wilson) found probable cause to believe that Mix met the criteria to qualify as an SVP. It therefore ordered him committed to Coalinga State Hospital[4] pending trial. The parties agreed to return on June 9, 2011 for a status conference. Mix waived his presence for that date.

For reasons the record does not make clear, counsel did not return before the court (Judge Katrina West) until July 8, 2011. On that date, King advised the court that Mix would be undergoing treatment "for some time." The parties agreed to set a status conference for January 20, 2012. King then obtained three additional continuances to allow Mix to continue treatment and to secure a *Litmon*[5] waiver from him. In the meantime, the prosecution requested and received updated evaluations from Drs. Korpi and Fox.

---

[4]    Between early 2011 and late 2012, Mix was actually placed in Atascadero State Hospital because he was simultaneously committed under the Mentally Disordered Offenders (MDO) Act (Pen. Code, § 2962). When commitment beyond his parole period was not recommended (*id.*, § 2970), he was transferred to Coalinga in January 2013.

[5]    In *People v. Litmon* (2008) 162 Cal.App.4th 383, the court recognized that defendants in SVP proceedings are entitled to a speedy trial under the due process clause of the Fourteenth Amendment. (*Id.* at p. 406.)

On April 30, 2012, Mix filed his first *Litmon* waiver, which stated:

"I, Robert Mix, hereby requests [*sic*] of this court that this case not be set for further hearing or trial for the next eight (8) months from the date of signing of this document[6], or until respondent advises this court that he wishes his case to proceed. I am in Phase 2 and wish to avail myself of this program. I understand that this request may affect my rights and remedies of due process under the *Litmon* case. Specifically, I understand that I have a right to a speedy trial. However, by requesting postponement of my case, I understand that I am waiving my right to a speedy trial under *Litmon.*"

On May 4, 2012, pursuant to the waiver, the court set a status conference for December 7, 2012. On that date, King requested a continuance to prepare a second *Litmon* waiver. Soon thereafter, she was appointed to the bench. In February and March 2013, the trial court (Judge Steven C. Malone) continued the matter to allow the public defender's office to reassign the case.[7] On April 5, 2013, DPD David McClave took over Mix's representation. He sought a continuance, indicating the *Litmon* waiver remained forthcoming. On May 5, 2013, Mix filed his second *Litmon* waiver, seeking a continuance for seven months from the date of signing (April 17, 2013, to expire November 17, 2013) so he could continue participating in treatment.

## B. *First* **Marsden** *Motion*

In the Fall of that year, DPD Frank Loo took over Mix's case. On October 4, 2013, before the previous waiver expired, Loo filed a "trial memo"

---

6    The waiver was signed April 17, 2012. Accordingly, this waiver would expire December 17, 2012.

7    During this time, DPDs Jeff Lowry and Lyly Brantley specially appeared one time each on behalf of Mix.

stating that "Mix wanted a quick trial date" and requesting his trial be set as soon as possible." Loo reiterated this request at a status conference before the court (Judge James M. Dorr) on November 8, 2013. He then requested to continue the matter until January 3, 2014 to allow him to confer with Mix. On that date, the court set a jury trial date for November 10, 2014.

On January 27, 2014, Mix sent a written request for a *Marsden* hearing to the trial court. He specifically noted that he did not want the public defender's office to represent him anymore. He wanted counsel from the bar panel. The motion was heard on March 21, 2014.[8]

At the outset of the closed hearing, in response to a question from the trial court (Judge Lorenzo R. Balderrama), Mix would not say he felt Loo had not properly represented him. But he expressed concern that Loo was new to SVP cases. He also believed they had "a little conflict of interest" because there were three witnesses from Atascadero State Hospital[9] that he wanted to testify in his case, but Loo did not think their testimony was necessary.

Mix observed that Loo was his "fifth lawyer in less than three years." He explained that when Pamela King was his attorney, he believed that he would complete two years of sex offender treatment and then proceed to trial. But now, with Loo, he must "start all over again."

The trial court noted it was not unusual for attorneys to leave offices and new attorneys to take over a case, and "that's why we have files" and "lawyer-client meetings to get to know each other." Upon confirming Mix had no other complaints, the court asked for a response from Loo.

---

[8]    This was the first time Mix appeared in court since the probable cause hearing. His presence at the intervening hearings was waived by counsel.

[9]    See footnote 4, *ante.*

Loo explained that although he had only been handling SVP cases since Fall 2013, he had two years' experience working on cases involving pleas of not guilty by reason of insanity and seven years with the public defender's office generally.  Before joining that office, he had about 15 years' experience in criminal and civil litigation.  With respect to Mix's case in particular, Loo recalled that he had visited Mix three times, and they had spoken over the phone several times.  He sent an investigator to interview the witnesses that Mix was interested in and determined they would not give helpful testimony.  Loo briefly spoke with Dr. Korpi about this case and retained a defense expert, Dr. Christopher Fisher, who interviewed Mix.

The trial court ultimately denied the *Marsden* motion, finding that Loo was properly and dutifully representing Mix, including following up on the witnesses that Mix had brought to his attention.

Back in open court, Loo advised the court that Mix had just signed a third *Litmon* waiver, to last one year from the date of filing (March 21, 2014, to expire March 21, 2015) in order to continue treatment.  The court accordingly set a status conference for January 30, 2015.

## C.   *On and Off the "Trial Track"*

About one week before that date, on January 21, 2015, Mix filed a fourth *Litmon* waiver for another year from the date of signing (January 8, 2015, to expire January 8, 2016) in order to continue treatment.  The court continued the status conference to June 5, 2015.

By the time of the June 5 conference, DPD Nazim Sial had taken over Mix's representation.  At Sial's request, the court continued the conference to December 4, 2015, within the previous time waiver.  On that date, Mix filed a fifth *Litmon* waiver for an additional six months "in order to prepare for

7

trial."[10]  The status conference was continued to May 26, 2016, and a trial date was set for July 11, 2016.

On April 7, 2016, DDA Daniel Ross—who had taken over for O'Connell—and Sial agreed to continue trial until August 1, 2016.  But as of June 2, 2016, they were still waiting for updated evaluations, and Ross had personal matters arise in August, so counsel agreed to reset trial for October 17, 2016.

Then, on August 4, 2016, counsel agreed to continue trial to January 30, 2017.  The defense was preparing a motion to quash Ross's subpoena for records from Coalinga based on principles of confidentiality.  Sial represented that, "based on discussions with Mr. Mix, he's agreeable to the continuance."  At a hearing on October 26, 2016, counsel stipulated to the trial court ordering Coalinga to produce a more limited set of records.

Around the same time, Sial asked the court to continue trial to April 10, 2017.  The reason for the request was not entirely clear at the time, but Sial noted he expected to be in trial until "at least January, February."  Ross did not object.  Sial subsequently requested to continue trial to June 26, 2017, and then to September 25, 2017.  Ross, again, did not object.  On March 17, 2017, Mix filed his sixth *Litmon* waiver, agreeing to postpone the proceedings

---

[10]  This waiver sought to postpone the proceedings for six months from the date of signing.  The waiver is signed and dated November 23, 2016.  Since the waiver was filed before then—in December 2015—we assume the signatories (Mix and a witness) accidentally dated it November 2016, instead of November 2015.  This is supported by the fact that, at the hearing on December 4, 2015, Sial advised the court that "[w]e filed a six-month waiver this week . . . ."  Moreover, as discussed below, it would not make sense for Mix to sign a waiver in November 2016, because the parties were actively setting (and continuing) trial dates during that time period.

for six months from the date of filing (until September 17, 2017). This waiver did not specify the reason he wanted to delay the proceedings.

On July 14, 2017, counsel appeared for a status conference and asked to continue trial to October 16, 2017. At the same time, Sial advised the court that Mix's "eagerness to go to trial" depended "on whether or not any of the evaluators flip" so it was "possible we could end up vacating those trial dates" as well. He expected updated evaluations by September. On September 1, 2017, Sial advised the court that Mix had "recently requested to continue his case so that he can do more sex offender treatment before trial." Ross agreed to vacate the existing trial dates. Later that same month, on September 21, 2017, Mix filed his seventh *Litmon* waiver to postpone the proceedings another year from the date of filing (until September 21, 2018).

At the next hearing, on September 22, 2017, Sial requested, and Ross agreed, to schedule a status conference for May 25, 2018. On that date, the conference was continued to July 20, 2018. Before then, on July 10, 2018, Mix filed his eighth *Litmon* waiver to postpone the proceedings for six months from the date of signing (July 3, 2018) "in order to prepare for trial."

## D.     *Second* **Marsden** *Motion*

Two months later, in September 2018, the appellate court in *People v. Superior Court* (*Vasquez*) (2018) 27 Cal.App.5th 36 (*Vasquez*) affirmed the dismissal of an SVP petition based on a violation of the defendant's right to a timely trial. The court attributed the "extraordinary" 17 year pretrial delay to "a systemic breakdown in the public defender system." (*Id.* at p. 41.)

On October 17, 2018, Mix appeared telephonically and raised his second *Marsden* motion to replace Sial. Before he was excluded from the courtroom, Ross offered his perspective on the issues he anticipated Mix would raise. Ross explained that when he was assigned to Mix's case two-

and-a-half years prior, the case was "on a fast track to trial in the late summer or early fall" of 2016. During that summer, however, the district attorney's office "became aware of an uncharged allegation of sexual molestation" by Mix. The office investigated the allegation and turned witness statements over to the defense, which seemingly prompted Mix to file a *Litmon* waiver. By the following summer, updated evaluations continued to indicate that Mix met the SVP criteria. As Ross understood it, Mix's position at that time was that he would only proceed to trial if "one or more of the evaluators flipped," so he signed another *Litmon* waiver.

In the closed courtroom, Mix, Sial, and the SVP unit supervisor, Ed O'Brien, remained. As relevant here, Mix asserted that his due process right to a speedy trial had been violated. He had been committed for eight years, and had six different attorneys. "Enough is enough," he said. He had repeatedly asked his attorneys "to push for trial" since 2013. Although he signed the *Litmon* waivers, he only did so because his attorneys needed him to; he was forced to choose between his rights to a speedy trial and to competent counsel. Mix requested a bar panel attorney to investigate and file a motion to dismiss. Sial could not handle the motion, Mix explained, "because he's part of the problem."

In response, Sial conceded that Mix had been requesting a trial. In the three years he had represented Mix, he arranged for Dr. Fisher to evaluate Mix around July 2016, and engaged an investigator and a social worker to prepare a release plan for Mix. He acknowledged "that some of the delay in Mr. Mix's case" was due to the fact that he had been handling probable cause hearings, trials, and writs for several other clients. Sial's caseload fluctuated between 19 and 23 cases. O'Brien then weighed in as to any alleged "structural issue." From his perspective, the reason Mix's case had not yet

10

gone to trial was because he "agreed to take the matter off the trial track" in 2017 when his updated evaluations were not favorable. Mix agreed to continue treatment in hopes that one of the doctors would "flip." To the extent Mix now prioritized his speedy trial right, the unit would "honor that" and assign his case to whichever attorney was soonest available to go to trial. Sial concurred that, in 2017, Mix wanted to continue the case to pursue additional treatment.

Given Mix's recent *Litmon* waiver and his decision to "get off the trial track," the court denied his *Marsden* motion. But it intended to set his case for trial as soon as possible, within the next few months. The court believed that Sial or someone else from the public defender's office would adequately represent him. Back in open court, both counsel and Mix agreed to give the defense time to complete Mix's release plan, request updated evaluations, and then set a trial date. By late November 2018, Mix's case was reassigned to DPD Harry Gobrecht.

Before trial dates were set, the court indicated it was considering revisiting its ruling on the *Marsden* motion. On December 19, 2018, in Mix's telephonic presence, the court reversed its earlier denial of the *Marsden* motion, citing a breakdown in communication. It relieved the public defender's office and appointed bar panel counsel Victor Marshall to represent Mix. Marshall, who was present in court, accepted the appointment. The court reiterated it hoped to try the case as soon as possible and set a status conference for January 18 and trial for June 24, 2019. Ross confirmed he would request updated evaluations right away.

E.    ***Motion to Dismiss***

On January 18, February 20, and March 13, 2019, the parties sought continuances. Marshall was waiting for transcripts in order to investigate

11

and prepare a motion to dismiss. At the March 13 hearing, Ross noted that the prosecution was ready to go to trial in June, but the motion to dismiss was beginning to conflict, timing-wise, with the current trial date. At Ross's suggestion, the court ordered Coalinga to permit Mix to appear telephonically at the next hearing to ascertain his priorities. On March 27, 2019, Marshall was still waiting for transcripts. Mix, appearing telephonically, maintained he did not want to waive his right to a speedy trial. The court therefore decided to keep the June 24, 2019 trial date and monitor the transcripts issue until then.

The defense filed its motion to dismiss on June 14, 2019. In critical part, the motion contended it was the "systemic failure" of the public defender's office that caused the almost nine-year delay in Mix's case. The "cycle of changing public defenders" required repeated continuances so counsel could get up to speed on the case, but they were never ready to go to trial. With each continuance and waiver, Mix faced a "Hobson's choice" of either going to trial with an unprepared lawyer or giving up his right to a speedy trial. He only signed the waivers to allow his attorneys to prepare for trial. The defense faulted the prosecutor for never objecting, and the trial court for granting continuances without finding good cause and failing to relieve the public defender's office sooner. The defense further argued that Mix suffered prejudice insofar as he had been "locked up" for several years awaiting trial, which caused him much anxiety, the inability to freely associate with his friends and family, and the loss of "what could have been the most productive years of his life."

Relying on *People v. Landau* (2013) 214 Cal.App.4th 1 (*Landau*), the prosecution asserted the court should set aside the time periods covered by *Litmon* waivers and individually analyze each intervening, nonwaived time

period. Applying that framework, the prosecution argued that only the initial 19-month period between September 2010 (when the petition was filed) and April 2012 (when the first *Litmon* waiver was filed) was sufficiently lengthy to trigger a speedy trial analysis. As to that initial period, the prosecution contended that Mix's speedy trial claim failed because every continuance was requested by his counsel, with his consent and/or at his request, as a matter of defense strategy to avoid SVP commitment. He never asserted his speedy trial right during this time period. Moreover, he suffered no prejudice because he was simultaneously committed as an MDO and there was no reason to believe his defense had been impaired. The prosecution disavowed any systemic issue in the public defender's office, arguing that although several attorneys had been appointed to represent Mix, that alone does not constitute a systemic breakdown. The prosecution highlighted the work Mix's counsel had done to prepare the defense, including retaining an expert, and the fact that the SVP unit had recently added two attorneys.

Due to the court's unavailability the following two weeks, as well as the likelihood that Mix would need to be transported to court for the motion to dismiss and trial, the court set an evidentiary hearing on the motion for July 8, 2019, with trial to follow depending on the outcome of that hearing. Mix, who was present via telephone, agreed to this plan. The July 8 hearing was subsequently continued to July 11, 2019 for unclear reasons.

1. *Evidentiary Hearing*

The hearing began on July 11 with the testimony of the supervisor of the SVP unit, DPD Ed O'Brien. He explained that he had been supervising the civil commitment unit since 2009, save for a couple of years between 2010 and 2012 when he was assigned elsewhere.

13

Soon after joining, O'Brien divided the unit so that certain attorneys were focusing on SVP cases, with an eye toward bringing those cases to trial faster. O'Brien acknowledged that, in March 2014, Mix was "rightfully" concerned about the number of attorneys that had been assigned to his case. The civil commitments unit had "several transfers" in and out "for a time." But the SVP team had been "stable" for the past five years. Then, in early 2018, two attorneys were added to the team, increasing the total to five or six dedicated SVP attorneys. The new additions decreased the pretrial caseload of each attorney, ranging from 4 or 5 cases to 12 or 14 cases each, depending primarily on how many clients were ready to go to trial. The team typically received one or two new cases each year.

With respect to Mix's case specifically, O'Brien reviewed the attorneys' notes in the file (from March 2014 to present)[11] and observed the case had been on and off the "trial track" a few times, with Mix's consent and/or at his request, for strategic reasons. He pinpointed March 2014, August 2016, and September 2017 as times Mix got off the trial track. Generally, when Mix was delaying trial, it was in order to participate in sex offender treatment and hopefully "flip a doctor" and improve his chances at trial. In the summer of 2016 specifically, Mix and Sial chose to take the case off the trial calendar when the additional allegation of abuse came to light. Any time there was a *Litmon* waiver, that indicated to O'Brien that Mix was not prioritizing trial.

O'Brien was familiar with the *Vasquez* case, and affirmed that the SVP team did not experience the resource cuts at issue there. To the contrary, the team added two new attorneys in 2018, and was supported by the office's investigators, social workers, and other staff. O'Brien noted that Sial never

---

[11]    The trial court found the business records exception to the hearsay rule (Evid. Code, § 1271) applied to these notes.

14

asked him to reassign Mix's case. If he had, someone on the team was available to try the case.

The hearing resumed on July 15 and 16, 2019 with the testimony of DPD Nazim Sial. When Sial first joined the SVP team in 2013, there were three attorneys on the team, and each had about 18 or 19 cases. Sial's caseload fluctuated between 18 and 23 cases over the next several years, until the team received two new attorneys in 2018, which eventually reduced his caseload to about 10 cases. Sial explained that he prioritizes his cases depending on the age of the petition, whether the client is asking to go to trial, and whether the client has received an evaluation concluding they do *not* meet the SVP criteria. When he is actively preparing a case for trial, his other cases go on the "back burner."

The number of cases on the trial track at any given time, however, was typically limited to about five or six cases per attorney. This was true for Sial as well. At most, he had seven or eight cases on the trial track at once. Among the cases on the trial track, some go back off the trial track, some are dismissed, and some get reassigned. For instance, in 2015, two or three of Sial's clients demanding speedy trials were reassigned to other SVP attorneys. Of course, some cases proceed to trial. In Sial's estimation, "a reasonable speed" would be three or four SVP trials a year.

As Sial explained, some clients choose to remain off the trial track for several strategic reasons. They might choose to participate in treatment and/or improve their behavior in the hospital, which helps their case by showing they are *not* a current risk to the public. Delaying trial can benefit the client by "put[ting] space between them and their past offenses," and by creating the possibility that an evaluator will flip, or a new evaluator will become assigned to the case and reach a different conclusion. Also, when

15

the client reaches certain ages, their statistical likelihood of reoffending decreases.

When Sial was first assigned to Mix's case in August 2014, he understood that Mix wanted to go to trial. But Sial had other cases scheduled to go to trial ahead of his, and also dealt with a medical issue that prevented him from trying any cases for some months. Around this time, Sial advised Mix he was unsure whether he would personally be able to try his case in 2015 under the circumstances. Sial recalled that Mix "understood the reality of that and the need to get prepared on the case, and so he was okay with talking about trial beginning in 2015." Mix was concerned "about the cost of his case getting reassigned again." Mix nevertheless maintained his desire to go to trial, and his case remained on the trial track.

His case was set for trial in 2016, but that summer, the parties learned of the new allegation of abuse against Mix. At the same time, Sial had another case that was due to go to trial. Sial discussed these issues with Mix, and he agreed to continue his trial to 2017. By the summer of 2017, Mix decided he did not want to go to trial unless and until one of the evaluators changed their opinion. His case was taken off the trial track for one year so he could continue treatment. The following summer, in July 2018, Mix agreed to postpone his trial six more months as Sial prepared to try another case. Then, in October 2018, Mix made his *Marsden* motion.

Even though Sial was preparing for trial in other cases, he was still working on Mix's case. In the four-plus years that Sial represented Mix, they spoke on the phone once or twice a month, and visited in person once or twice a year. There was "a significant ramp up" in the time Sial spent on Mix's case in early 2017, when they were preparing for trial. This included

reviewing several thousand pages of documents—discovery, prior offenses, and evaluations—discussing the case with Mix, contacting defense evaluators, and engaging investigators and social workers to work on a release plan.

Between 2014 and 2017, Sial admitted "there were definitely times" when "the primary obstacle of us going to trial" was that he "was involved in other cases." Indeed, from Sial's perspective, the fact that he had other cases accounted for most of the delay until 2017. Although Mix seemed frustrated at times because he wanted to go to trial, and he could have requested another attorney, he chose to stick with Sial. He did not want his case to be passed on yet again.

If Mix demanded a speedy trial and refused to sign any more waivers, Sial did not know whether the case would be reassigned. He believed it would depend on the caseloads of other attorneys on the team at that time. He explained it is difficult to "hand off" SVP cases because they typically involve records that are up to 20,000 pages in length, and it takes at least six months to prepare a case for trial "given civil discovery deadlines, the need for updated evaluations," and "the need for defense evaluators." Sial believed that Mix understood this.

The hearing continued on August 14, 2019 with Mix's testimony. Mix testified that he told every attorney he had that he wanted a speedy trial. He reiterated that when Pamela King represented him, he believed he would participate in treatment for two years and then go to trial around 2013. From Dave McClave to Frank Loo and then Nazim Sial, he consistently wanted to go to trial. He acknowledged, however, that he did not demand a speedy trial in court other than the 2013 trial memo and the 2018 *Marsden* hearing. Every time he signed a *Litmon* waiver, it was because his counsel

needed time to prepare, and he wanted effective counsel. He felt he had no choice but to sign the *Litmon* waivers and agree to the continuances.

Mix denied that it was more important to him to stay with Sial rather than have a speedy trial. If he asked for new counsel, it would take time for them to get up to speed. He did not want to start all over again, and he did not want to risk being appointed a less skilled attorney, or an attorney he did not get along with.

Mix maintained he wanted to go to trial even though he never received a negative evaluation—meaning, an evaluation concluding he did *not* meet the SVP criteria—from Drs. Fox and Korpi. His desire for a speedy trial only strengthened in 2016 when the defense expert, Dr. Fisher, gave him a negative evaluation. Mix denied that he wanted to go off the trial track in the summer of 2017 in order to flip a doctor. Although he got the impression that one of the doctors might flip if he participated in further treatment, he still wanted to go to trial. The reason they did not go to trial at that time was because Sial was not ready. Mix also denied that the new allegations that came to light in 2016 deterred him from pursuing trial.

2.    *Argument and Decision*

After Mix's testimony, the court heard argument from counsel. Marshall emphasized that the reason for the delay was the systemic breakdown in the public defender's office. In his view, the office did not have enough SVP attorneys, and those it had were coming and going. Considering the number of cases the team had, and the pace at which cases were brought to trial, it was not possible for Mix to receive a timely trial. He suggested that adding two attorneys to the team was an attempt to correct the issue, and thus evidence that there was a problem. He also highlighted that the court and prosecution bore some blame in failing to push the case along.

18

Ross, in response, agreed the "key" or "threshold" issue was whether there was systemic breakdown. If not, then every request for continuance by the defense was attributable to Mix, and all of his *Litmon* waivers were enforceable. Ross maintained there was no systemic breakdown. The delay was the result of individual attorneys prioritizing their caseloads in consultation with their clients. Mix made an informed choice to postpone his trial in order to keep his current counsel, to deal with the new allegations of sexual abuse in the summer of 2016, and to flip an evaluator in the summer of 2017. A heavy caseload, or a turnover of attorneys, does not constitute systemic breakdown. The decision to bring in additional attorneys was prophylactic, not corrective. He then reiterated his analysis of the discrete time periods between waivers, described above. He added that Mix "ratified" each nonwaived period by filing another waiver.

The trial court took the matter under submission, and ultimately denied the motion to dismiss at a hearing on September 25, 2019. Referencing *People v. Williams* (2013) 58 Cal.4th 197 (*Williams*), the court observed that a systemic breakdown requires evidence identifying systemic or institutional problems in a public defender's office, not just problems with individual attorneys. For example, in *Vasquez, supra*, 27 Cal.App.5th 36, the court found systemic breakdown based on evidence of a 50 percent cut to the public defender's office funding and staffing in that county. (*Id.* at p. 41.) Here, there was no such evidence. To the contrary, the court found "all the delays were caused by [Mix] and his attorney as tactical decisions for [him] to achieve a better result at trial while [he] participated in [treatment] and continually sought updated evaluations, hoping that an evaluator would flip his evaluation from positive to a negative position . . . ." To the extent Mix's claims of disagreement with Sial were "to be believed," the court found that

19

was "a matter between [Mix] and his attorney and not a breakdown of the public defender system."

Absent evidence of systemic breakdown, the court attributed each request or acquiescence by defense counsel to Mix, and gave effect to the *Litmon* waivers he signed. Upon reviewing the series of waivers, the court found that Mix waived his due process right to a speedy trial for the following time periods: April 2012 to December 2012; April 2013 to November 2013; March 2014 to June 2016; and November 2016 to October 2018. Following *Landau*, *supra*, 214 Cal.App.4th 1, it analyzed the remaining unwaived periods individually: September 2010 to April 2012 (19 months); December 2012 to April 2013 (four months); November 2013 to March 2014 (four months); June 2016 to November 2016 (five-and-a-half months); and October 2018 to present (10 months).[12]

Applying the *Barker* factors[13] to those discrete time periods, the court found that the initial 19-month period—from September 2010 to April 2012— was "presumptively prejudicial since it is over a year." With respect to that

---

[12]    Our calculation of the waived and unwaived periods is slightly different from the trial court, consistent with the prosecution's calculation set forth in its supplemental opposition to the motion to dismiss. We suspect the difference is attributable to the error on the November 23, 2015 *Litmon* waiver (see fn. 10, *ante*), which caused the trial court to count that waiver twice (as effective December 4, 2015 and November 23, 2016). In any event, Mix did not raise any error on this point in the trial court or on appeal.

[13]    As discussed in greater detail below, the high court in *Barker v. Wingo* (1972) 407 U.S. 514 prescribed a four-factor balancing test for determining whether a defendant's Sixth Amendment right to a speedy trial was violated. The factors are: (1) length of the delay; (2) reason for the delay; (3) the defendant's assertion of their right; and (4) prejudice to the defendant. (*Id.* at p. 530.) These factors are used to evaluate a claimed denial of a timely trial in the SVPA context as well. (*Camacho*, *supra*, 15 Cal.5th at p. 379.)

period, it found the reason for the delay was attributable to Mix, as the defense requested all of the continuances. Moreover, Mix never asserted his speedy trial right during that period, and he suffered no prejudice since he was dually committed as an MDO during that time.

As to the next three time periods—December 2012 to April 2013 (four months); November 2013 to March 2014 (four months); and June 2016 to November 2016 (five-and-a-half months)—the court found they were "all less than a year old" and therefore did "not trigger presumptive prejudice." In any event, it found that Mix "requested all of the continuances" during these periods "which were granted by the Court with reasons given." During these periods, the court found that Mix never asserted his speedy trial rights—he was engaged in treatment instead—and he was not prejudiced.

Regarding the final period—October 2018 to present (10 months)—the court again found the delay did "not cross the threshold of presumptive prejudice." It nevertheless analyzed the remaining factors, finding "the delays were at the request of [Mix], or as a consequence of seeking a new attorney, or pursuing his speedy trial litigation." It recognized that Mix asserted his speedy trial right in the *Marsden* hearing in October 2018. But Mix then agreed to postpone trial in order to complete his release plan. When he decided *not* to complete that plan in December 2018, both counsel and Mix personally agreed to a June 2019 trial date. From then on, the parties were litigating the speedy trial motion, and Mix "cannot claim a speedy trial violation regarding the time necessary to litigate his speedy trial violation." It also saw no evidence of actual prejudice to Mix.

The court lastly commented, based on its experience handling SVP cases, "that such delays on the part of SVP respondents and their attorneys is not unreasonable and makes perfect sense. When respondents are facing the

21

potential of an indefinite commitment as [SVPs], they may very well be reluctant to face a jury with such SVP allegations unless there is a better chance at success, such as the completion of [treatment], or the successful flipping of an evaluator from positive to negative."

Thus, the court concluded there was no violation of Mix's due process right to a speedy trial and denied the motion to dismiss. The defense then requested a stay of the proceedings to pursue a petition for writ of mandate. Mix filed the writ in pro per, which was summarily denied on May 15, 2020.

## F. *Trial and Commitment Order*

Mix ultimately went to trial in the Spring of 2023, with bar panel attorney Mustafa Abdul-Rahman representing him. At trial, evidence was presented that Mix sexually abused several young girls. One expert opined that Mix met the SVP criteria, while two reached the opposite conclusion. A jury found true that Mix qualified as an SVP. The trial court ordered Mix committed to DSH.

## DISCUSSION

## A. *The Trial Court Acted Within Its Discretion In Denying Mix's Motion to Dismiss Based On An Alleged Speedy Trial Violation*

Mix principally contends the trial court erred in denying his motion to dismiss. He maintains that he wanted to go to trial throughout the proceedings, his many *Litmon* waivers were invalid because he had no choice but to sign them, and the delay in his case was attributable to the prosecution, the trial court, and a breakdown in the public defender system. To the contrary, we conclude the denial of Mix's motion was reasonable and supported by the record.

1. *Standard of Review*

"We review for abuse of discretion a trial court's ruling on a motion to dismiss for prejudicial pretrial delay." (*Vasquez, supra*, 27 Cal.App.5th at p. 55; accord, *In re Kerins* (2023) 89 Cal.App.5th 1084, 1099 (*Kerins*); *People v. DeCasas* (2020) 54 Cal.App.5th 785, 801 (*DeCasas*).) "Under that standard, '[t]he trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.' " (*Camacho, supra*, 15 Cal.5th at p. 383.)

2. *The* Barker *Framework*

Significant pretrial delays in SVP cases—reaching 15 years or more— " 'can and do occur.' " (*Camacho, supra*, 15 Cal.5th at p. 376 & fn. 2.) This is generally attributable to a few unique features of the SVPA. First, "SVP trials, unlike criminal trials and most types of civil trials, are not subject to statutory time limits." (*Id.* at p. 377.) Second, "SVP trials are unlike criminal trials in that they are not aimed primarily at establishing an individual's liability for past events, but instead at establishing the individual's *present* need for mental health treatment. Although an SVP proceeding may involve inquiry into certain facts about an individual's criminal history, the central focus of an SVP trial is whether the individual *currently* has a mental disorder that poses a danger to the public and thus requires hospitalization." (*Ibid.*, italics added, citations omitted.)

Third, "[o]nce a judge has found probable cause to believe an individual is an SVP, that individual is held in a state hospital and begins to receive mental health treatment—even before trial is ever held. For this reason, both sides may have a common interest in delaying trial. From the individual's perspective, allowing more time for treatment may ultimately

23

improve the chance of success at trial, insofar as treatment may help address a mental disorder that a jury might otherwise find poses a risk to the public. . . .  For the state's part, there are limited incentives to expend the resources necessary to push the case toward trial when, following a finding of probable cause, the individual is already being hospitalized and receiving treatment."  (*Camacho*, *supra*, 15 Cal.5th at p. 377, citations omitted.)

While lengthy pretrial delays are common in SVPA cases, that does not mean that any amount of delay under any circumstance is constitutionally tolerated.  Individuals "facing SVP commitment have a due process right to a timely trial."  (*Camacho*, *supra*, 15 Cal.5th at p. 368; see also *Vasquez*, *supra*, 27 Cal.App.5th at p. 57 [ "the SVPA is a civil commitment proceeding, not a criminal prosecution to which the Sixth Amendment right to a speedy trial attaches"].)  To evaluate claims of excessive pretrial delay under the due process clause, we borrow the framework used to assess alleged speedy trial violations under the Sixth Amendment in criminal cases, as set forth in *Barker v. Wingo* (1972) 407 U.S. 514 (*Barker*).  (*Camacho*, at pp. 379, 381.)[14]

The high court in *Barker* "identified four factors for courts to examine: the length of the pretrial delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant caused by the delay."  (*Camacho*, *supra*, 15 Cal.5th at p. 380, citing *Barker*, *supra*, 407 U.S. at p. 530.)  "The defendant carries the 'burden of demonstrating a speedy trial

---

[14]    Prior to *Camacho*, many California courts evaluated speedy trial claims in SVPA cases under the *Barker* framework *and* the general balancing test described in *Mathews v. Eldridge* (1976) 424 U.S. 319.  *Camacho* held it was unnecessary to apply the *Mathews* test; the *Barker* framework sufficed. (*Camacho*, *supra*, 15 Cal.5th at pp. 379, 381–382.)  In this case, the trial court applied both *Barker* and *Mathews* in denying Mix's motion to dismiss. In light of *Camacho*, Mix expressly acknowledges it is not necessary to address *Mathews* on appeal.  We agree.

violation under *Barker*'s multifactor test.' " (*Camacho*, at p. 380.) "Because none of these factors is dispositive, 'courts must still engage in a difficult and sensitive balancing process' to determine whether trial has been unconstitutionally delayed." (*Ibid.*) "In other words, there is no algebraic formula. The court must use its informed judgment in assigning the weight to be allocated to each factor considered in a given case." (*Landau*, *supra*, 214 Cal.App.4th at p. 37.) We address each of the four factors in turn.

a. *Length of the Delay*

The length-of-delay factor "is actually a double enquiry." (*Doggett v. United States* (1992) 505 U.S. 647, 651 (*Doggett*).) "Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay, since, by definition, he cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness." (*Id.* at pp. 651–652, citation omitted.)

In this threshold context, " 'presumptive prejudice' does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry." (*Doggett*, *supra,* 505 U.S. at p. 652, fn. 1; see also *Camacho*, *supra*, 15 Cal.5th at p. 383 [this factor "operates as a threshold hurdle; '[u]ntil there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance' "].) In criminal cases, "courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year." (*Doggett*, at p. 652, fn. 1.)

If the accused makes this threshold showing, "the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the

25

claim. This latter enquiry is significant to the speedy trial analysis because . . . the presumption that pretrial delay has prejudiced the accused intensifies over time." (*Doggett, supra*, 505 U.S. at p. 652, citation omitted.)

Here, Mix contends the trial court stumbled at the first step by setting aside the time periods covered by *Litmon* waivers and only analyzing the intervening, nonwaived periods. In other words, he argues the court erred in conceptualizing the pretrial delay as five distinct periods of 19 months, four months, four months, five-and-a-half months, and 10 months, instead of a single nine-year period. Mix claims to have "found no support for the trial court's decision to break the delays into small pieces and then arbitrarily declare them not long enough to create a presumption of prejudice so that the first factor would not weigh in [his] favor." He ignores the case the court expressly relied on, *Landau, supra*, 214 Cal.App.4th 1.

In *Landau*, the defendant was tried on an SVP petition three times; the first two trials ended in mistrial, and the third resulted in commitment. (*Landau, supra*, 214 Cal.App.4th at pp. 8, 10.) On appeal, the defendant contended the delay preceding each of his three trials amounted to a denial of due process. (*Id.* at pp. 8, 27.) In applying the first *Barker* factor to the delay preceding the first trial, the *Landau* court acknowledged "the *length of the delay* was extreme if the entire delay"—five years and seven months—"is considered." (*Id.* at pp. 36–37, italics added.) "However, the *reason for the delay* was, for the most part, because [defendant] either asked for it or stipulated to it, often with what were purported to be time waivers." (*Id.* at p. 37.) When the delay is "at [defendant's] request or with his consent," the *Landau* court opined, "the weight accorded the delay is reduced." (*Ibid.*, citing *Barker, supra*, 407 U.S. at p. 529.) "A potential civil committee may not seek to continue his trial over and over again and then be heard to

26

complain the court violated due process by granting his requests." (*Landau*, at p. 37.)  Focusing on the unconsented-to delay preceding the first trial, a matter of 20 days, the court determined the presumption of prejudice was not raised.  (*Id.* at pp. 36–38.)

The *Landau* court nevertheless considered the remaining *Barker* factors with respect to the unconsented-to 20-day period.  It observed the reason for that delay was " 'a particular two week spree' " of court congestion when many court staff members were on vacation.  (*Landau, supra*, 214 Cal.App.4th at p. 37.)  There was no evidence the congestion was chronic or systemic.  (*Ibid.*)  Moreover, the defendant did not assert his right to a timely trial until 14 days into this 20-day period.  (*Ibid.*)  At that point, the defendant demanded an immediate trial or dismissal, and his trial commenced six days later.  (*Ibid.*)  Lastly, the court detected "no discernable prejudice caused by this 20-day delay," noting there was "no allegation that the result of the first trial, already favorable, would have been any more favorable had he received his trial in the middle of May 2006"—when he stopped consenting to the delay—"instead of early June 2006."  (*Id.* at pp. 36–37.)  On balance, the court concluded the delay preceding the first trial did not violate due process.  (*Id.* at p. 38.)  It employed a similar approach in analyzing the delay preceding the second and third trials.  (See *id.* at pp. 42–44.)

Without discussing *Landau*, the appellate court in *Kerins*, *supra*, 89 Cal.App.5th seemed to take a similar approach.  In evaluating the defendant's claim of unconstitutional pretrial delay, it measured the length of the delay from the date the SVP petition was filed until the date defense counsel filed a " 'waiver of presence and of trial,' which included a declaration from [the defendant] stating he asked [counsel] to 'explore [his] legal

27

remedies' and 'delay [his] trial.' " (*Id*. at p. 1099.)  Since the delay between those two dates—14 years—was "extraordinary" even without the waived period, the *Kerins* court opined that factor weighed "heavily" in the defendant's favor and proceeded to evaluate the remaining *Barker* factors. (*Kerins*, at p. 1099.)

To be sure, in some SVPA cases the entire length of the pretrial delay was considered in applying the first *Barker* factor, even if the defendant had requested or agreed to continue trial for some amount of time, or waived time.  (See, e.g., *Vasquez, supra*, 27 Cal.App.5th at p. 61; *DeCasas, supra*, 54 Cal.App.5th 785.)  But in those cases, the propriety of the *Landau* approach, or something similar, was not in dispute.  Indeed, the Attorney General often concedes the length-of-delay factor in such cases.

Notably, in *Camacho*, the Attorney General urged the Supreme Court to focus its inquiry on an eight-year period when the defendant did not personally appear in court, as opposed to a four-year period when he frequently appeared in court and entered a general time waiver.  (15 Cal.5th at p. 383.)  At the same time, the Attorney General conceded that an eight-year delay was " 'significant' in its own right, and so 'the length of the delay' " weighed in the defendant's favor.  (*Ibid*.)  The *Camacho* court agreed and thus had no occasion to decide the issue.  (*Ibid*.)

While the *Landau* approach may be uncommon, it has not been squarely criticized, and Mix offers us no principled reason to reject it here. To the extent the length of the delay operates as a threshold inquiry, the trial court in this case analyzed the remaining *Barker* factors even for the shorter periods of time it did not consider presumptively prejudicial.  And although the court did not expressly apply those remaining factors to the periods covered by *Litmon* waivers, it seems the analysis could only go one way:

the reason for the delay was that Mix requested to postpone trial; when he was waiving his right to a speedy trial, he was not asserting that right; and he was accountable for any additional prejudice suffered by his own request to delay the proceedings. (See, e.g., *Williams*, *supra*, 58 Cal.4th at p. 240 [thirteen month period where defendant "acquiesced in continuances" and six-month period where he "consistently waived time . . . are properly charged to defendant"].) Mix does not develop an argument otherwise.

Finally, Mix suggests his *Litmon* waivers were invalid because he had no choice but to sign them. He maintains that if he refused to sign the waivers, "he would either be taken to trial by an unprepared attorney or be shifted to a new attorney who will still be unable to take him to trial in a timely fashion." In other words, he claims the only reason he signed the waivers was because his attorneys were not prepared. Substantial evidence supports the trial court's implicit finding otherwise. (See *Mathew Zaheri Corp. v. New Motor Vehicle Bd.* (1997) 55 Cal.App.4th 1305, 1313 ["[W]e presume that the judgment is correct. As to factual matters not actually and unequivocally determined in the opinion of the trial court, we imply any necessary findings in support of the judgment which are supported by the evidence"]; *People v. Brents* (2012) 53 Cal.4th 599, 618 [express and implied findings are reviewed for substantial evidence].) Before Mix signed his first *Litmon* waiver, Pamela King advised the court that he would be undergoing treatment "for some time." Indeed, the first, second, third, and fourth waivers were for the express purpose of continuing treatment.

The sixth and seventh *Litmon* waivers did not specify the reason Mix sought to postpone the proceedings. But based on subsequent explanations

and testimony provided to the trial court by Ross, O'Brien,[15] and Sial, there was evidence that Mix signed the sixth waiver after the new allegations of sexual abuse came to light, and he signed the seventh waiver in order to participate in further treatment when one of the evaluators did not "flip" as expected.

The fifth and eighth *Litmon* waivers each asked the trial court to postpone the proceedings for six months "in order to prepare for trial." But in each instance, the waiver was signed after Mix had been off the trial track for several months participating in treatment. As Sial explained, it takes about six months to prepare a case for trial "given civil discovery deadlines, the need for updated evaluations," and "the need for defense evaluators." Sial believed Mix understood this. Accordingly, when Mix signed these six-month waivers, it was to afford Sial the minimum time necessary to become familiar with the many months of treatment Mix had completed, receive and review updated evaluations, arrange the testimony of defense experts, and more. In other words, when Mix reasonably chose to participate in prolonged treatment, it was naturally going to take time for Sial to refocus on his case and prepare for trial. Under these circumstances, we do not consider it unfair to hold Mix to these waivers. (Cf. *Vasquez*, *supra*, 27 Cal.App.5th at pp. 62–63 ["it is unfair to give significant weight to [the defendant's] failure to assert his right to a speedy trial" where he failed to object to multiple

---

15    Mix urges this court to ignore O'Brien's "uninformed" testimony since he had no direct involvement in this case until the 2018 Marsden hearing. But in reviewing the record for substantial evidence, we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' " (*In re Caden C.* (2021) 11 Cal.5th 614, 640.) As noted above, the court found that O'Brien's testimony was admissible under the business records exception, and Mix does not challenge that ruling on appeal.

continuances during a two-year period in which a 50 percent reduction in staffing hampered defense counsel's ability to prepare for trial].)

In sum, Mix has failed to demonstrate the trial court abused its discretion in evaluating the length-of-delay factor.

b. *Reasons For the Delay*

The second *Barker* factor "is the 'flag all litigants seek to capture' because the permissibility of pretrial delay depends to a great extent on who bears responsibility for it and why." (*Camacho*, *supra*, 15 Cal.5th at pp. 383–384, citation omitted.) "In analyzing the second factor, courts examine 'whether the government or the criminal defendant is more to blame for th[e] delay.' Courts also examine why the delay occurred, for 'different weights should be assigned to different reasons.' " (*Id*. at p. 384, citations omitted.)

"If the government deliberately delays trial to hamper the defense, for instance, that effort at manipulation 'should be weighted heavily against the government.' 'A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.' " (*Camacho*, *supra*, 15 Cal.5th at p. 384, citations omitted.)

"By contrast, 'if delay is attributable to the defendant, then his waiver [of his right to a speedy trial] may be given effect under standard waiver doctrine.' " (*Camacho*, *supra*, 15 Cal.5th at p. 384, quoting *Barker, supra*, 407 U.S. at p. 529; accord, *Vermont v. Brillon* (2009) 556 U.S. 81, 90 (*Brillon*).) This principle "accords with the reality that defendants" may seek to delay trial for their own tactical reasons. (*Brillon*, at p. 90.) "Delays sought by

31

counsel," whether appointed or retained, "are ordinarily attributable to the defendants they represent." (*Id*. at p. 85.)

Here, Mix does not dispute that all of the continuances in his case were at the request or with the consent of the defense. He contends the trial court erred in attributing these delays to him, instead of the state, in light of the "systemic problems" in the public defender's office. He further argues the court erred in failing to recognize "its own responsibility for the delays" as well as "the acts" of the prosecution's office.

### i. *Systemic Breakdown*

As noted above, in *Brillon*, *supra*, 556 U.S. 81, the high court held that "delays sought by counsel," whether appointed or retained, "are ordinarily attributable to the defendants they represent." (*Id*. at p. 85.) It observed, however, that this general rule "is not absolute." (*Id*. at p. 94.) "Delay resulting from a systemic 'breakdown in the public defender system' could be charged to the State." (*Ibid*., citations omitted.) The high court did not define "systemic breakdown," although it determined the record in that particular case did not establish any such breakdown. (*Id*. at pp. 87, 94.)

In *Brillon*, nearly three years elapsed between the defendant's arrest and his jury trial. (556 U.S. at p. 84.) In that time, the defendant was appointed six different attorneys. (*Id*. at p. 85.) The first attorney moved for two continuances, citing a heavy workload. The court denied the requests, and then the defendant "fired" him. (*Id*. at pp. 85–86.) The second immediately withdrew based on a conflict, and the third moved to withdraw because the defendant threatened his life. (*Id*. at pp. 86–87.) The fourth and fifth attorneys similarly requested continuances based on a heavy caseload and a conflicting trial out of town, respectively. (*Id*. at pp. 87–88.) Before the court ruled on their requests, they were dismissed based on issues with their

32

state contracts. (*Ibid.*) The sixth attorney brought the defendant to trial. (*Id.* at p. 88.) The *Brillon* court discerned nothing in the record suggesting that institutional problems caused these delays. (*Id.* at p. 94.)

In *Williams*, *supra*, 58 Cal.4th 197, the Supreme Court considered whether a four-year period where defense counsel failed to make progress in the defendant's case was chargeable to the defendant—under the general rule that delays sought by counsel are attributable to the defendant—or to the state based on systemic breakdown in the public defender system. (*Id.* at pp. 241, 245.) During the relevant period in *Williams*, the defendant was first appointed a public defender. (*Id.* at pp. 215, 241–242.) The defendant raised multiple *Marsden* motions against his first attorney based on his lack of progress. (*Id.* at p. 241.) The attorney admitted he was " 'too busy,' " he wanted " 'to get rid of a few cases,' " and being " 'in court every day, all day' was impeding his ability to work on motions." (*Ibid.*) More than one year into the case, the attorney moved to continue trial, averring he had not completed investigating the defendant's case because he had 10 other cases set for trial around the same time. (*Id.* at pp. 241–242.) Six months later, he again sought a continuance, stating he had been unable to focus on the defendant's case due to his schedule and caseload. (*Id.* at p. 242.) He was relieved when the public defender's office declared a conflict. (*Ibid.*)

After six months of inactivity while the criminal defense panel attempted to arrange counsel for the defendant, a bar panel attorney was appointed. (*Williams*, *supra*, 58 Cal.4th at p. 242.) Seven months into his representation, the attorney admitted he had not been able to work on the defendant's case because he had been engaged in two other capital cases. He represented the defendant four additional months before declaring a

conflict, during which time he made no significant progress. (*Id.* at pp. 242–243.)

Another bar panel attorney then took over the case. (*Williams*, *supra*, 58 Cal.4th at p. 243.) He initially requested a continuance "because he had 'about eight murder cases still set pending for next year.' " (*Ibid.*) Over the next several months, the attorney made little progress on the case due to issues securing an investigator. (*Id.* at pp. 243–244.) He later withdrew based on a breakdown in his relationship with the defendant. (*Id.* at p. 244.) The final appointed attorney told the court: " 'We basically started from scratch; nothing had been done for the past six years essentially.' " (*Ibid.*)

On that record, the *Williams* court acknowledged "the chronic lack of progress and repeated coming and going of defense counsel notwithstanding defendant's recurring complaints that nothing was being done to bring him to trial." (*Williams*, *supra*, 58 Cal.4th at p. 248.) The court further recognized that "the apparent inability of multiple attorneys . . . to move defendant's case forward in a timely manner suggests more than the usual challenges facing appointed counsel." (*Id.* at pp. 244–245.) Nevertheless, on that record, the *Williams* court was unable to conclude the delay resulted from a systemic breakdown. (*Id.* at p. 241.) The court rejected the defendant's contention "that the 'revolving door' of appointed counsel over the lengthy pretrial period qualifies as a ' "systemic breakdown in the public defender system" ' within the meaning of *Brillon.*" (*Williams*, at p. 248.) Although it was "*possible*" that the " 'revolving door' " was "indicative of institutional problems,' " the record contained no facts supporting that conclusion. (*Ibid.*, italics added.)

The *Williams* court clarified, to show systemic breakdown in the public defender system, there must be "evidence identifying *systemic* or *institutional* problems and not just problems with individual attorneys." (58 Cal.4th at

34

p. 249.)  Given the appellate record in that case, the court could not determine "whether the lack of progress was attributable to each attorney's own inability to properly manage or prioritize his or her caseload, or whether the performance of individual attorneys was indicative of unreasonable resource constraints, misallocated resources, inadequate monitoring or supervision, or other systemic problems."  (*Ibid*.)

By contrast, the appellate court in *Vasquez, supra*, 27 Cal.App.5th 36 identified a systemic breakdown in the public defender system.  (*Id*. at p. 41.)  In that case, the defendant was detained in state hospitals for more than 17 years "as a series of six appointed attorneys slowly moved his case toward trial."  (*Id*. at p. 40.)  During the first 11-and-a-half years of the pretrial period, the defendant was represented by two public defenders who seemed to make little progress on the case, other than filing a couple of motions.  (*Id*. at p. 70.)  But because there was "no evidence that this delay resulted from a breakdown in the public defender system," the delay during this period was charged to the defendant (save for a three-and-a-half month period when the public defender's office declared itself unavailable due to funding issues, which was attributed to the state).  (*Id*. at p. 70 & fn. 22.)  During the following two years, the defendant's third public defender "made diligent progress" on the case and the defendant expressly waived his speedy trial right for at least 10 months of this period.  (*Id*. at pp. 47–48, 70.)  This two-year period was attributed to the defendant as well.  (*Id*. at p. 70.)

Fourteen years into the defendant's pretrial confinement, however, things took a turn.  (*Vasquez, supra*, 27 Cal.App.5th at p. 41.)  The public defender's officer suffered a 50 percent cut to its attorney staffing and the loss of paralegals, which impaired his third public defender's ability to prepare for trial.  (*Id*. at pp. 41, 71.)  For about two years, she made

"sluggish progress" in preparing. (*Id*. at p. 72.) She repeatedly alerted the trial court to the effects of the dramatic cuts, including her increased workload, the loss of the paralegal assigned to the case, and the lack of time to meet with experts and prepare motions. (*Id*. at pp. 48–50, 71.) Then, just months before trial, the office transferred the attorney out of the SVP unit. (*Id*. at p. 71.) She attempted to fight the transfer, alerting her supervisor that it would be disruptive to her clients with trials set, to no avail. (*Id*. at pp. 53, 72.) "After [the defendant's] fifth attorney requested yet another continuance to prepare for trial, [he] objected, declaring, 'Enough is enough.' " (*Id*. at p. 41.)

On that record, the *Vasquez* court concluded "the trial court did not err in finding '[t]he dysfunctional manner in which the Public Defender's Office handled [the defendant's] case was precisely the type of systemic or institutional breakdown contemplated by *Brillon* and *Williams*. Accordingly, the reason for the delay in bringing the case to trial should be attributed to the state, and not to' " the defense. (*Vasquez*, *supra*, 27 Cal.App.5th at p. 73.) Although the court recognized "that an individual public defender will at times have a heavy caseload that hinders his or her ability to move a case swiftly toward trial," that situation was "a far cry from the dramatic budget cuts in the public defender's office that impeded [the attorney's] preparation for trial over a two-year period, then caused yet another year of delay after she was transferred out of the SVP unit on the eve of trial." (*Ibid*.)

The appellate court in *DeCasas*, *supra*, 54 Cal.App.5th 785 addressed a claimed speedy trial violation involving "the same reduction of the SVP unit staff and corresponding increase in attorney caseloads" at issue in *Vasquez*. (*DeCasas*, at p. 809.) In *DeCasas*, it was undisputed that the first eight years of pretrial delay, "most of which resulted from continuances that [defense]

36

counsel requested or stipulated to, are generally attributable to" the defense. (*Id*. at p. 808.) The issue was whether "the SVP unit staff reductions in 2014 constitute[d] a systemic breakdown such that the resulting delays should be attributable to the state." (*Ibid*.) Since the public defender in *DeCasas* was affected by the staffing cuts in virtually the same manner as in *Vasquez*, the *DeCasas* court reached the same conclusion. (*DeCasas*, at p. 810.)

Here, the record supports the trial court's finding that there was *no* evidence of systemic or institutional problems in the public defender's office. As the trial court noted, there is no evidence of budget cuts or dramatic reductions in staffing of the SVP team in this case. To the contrary, O'Brien testified that the SVP team had been "stable" since the middle of 2014, had added two attorneys in 2018, and was supported by the office's social workers, investigators, and other staff.

It is indisputable that Mix had five attorneys in the almost-nine years between the petition filing and the motion to dismiss (plus two attorneys who made occasional special appearances). O'Brien acknowledged that the civil commitments unit had "several transfers" in and out "for a time." But as *Brillon* and *Williams* make clear, the mere cycling of attorneys does not itself establish systemic breakdown. And here, there is no evidence showing that the reason attorneys were leaving Mix's case, or the civil commitments unit in general, was some systemic or institutional problem. Other than Pamela King and Nazim Sial, the record is not clear what happened to the other attorneys. By contrast, in *Vasquez* the record showed that the attorney was transferred against her will in the course of a dramatic restructuring of the SVP unit. (*Vasquez, supra*, 27 Cal.App.5th at pp. 50–51, 53.)

Comparing his case to *DeCasas*, Mix contends the caseloads of the attorneys of the SVP team in this case evidenced a systemic problem.

In *DeCasas*, the 50 percent staffing cuts suddenly increased each attorney's caseload to about 12 cases. (54 Cal.App.5th at p. 795.) In response, the supervisor of the SVP unit advised senior management that " 'no lawyer can be competent with such an added workload in such a short period of time' and that 'each attorney has had difficulty with their increased workload.' " (*Ibid*.) The attorneys within the SVP unit wrote anonymous letters to the public defender, the county board of supervisors, and the state bar, explaining how the staffing cuts would devastate their ability to effectively represent their clients. (*Id*. at p. 796.) The caseload of the defendant's appointed counsel doubled to 14 cases. (*Id*. at p. 798.) He felt " 'overworked' " and " 'overwhelmed.' " (*Id*. at pp. 797–798.) The increased workload impaired his ability to prepare for the defendant's trial. (*Ibid*.)

Mix's point is that, if an increased caseload of about 12 to 14 cases was overwhelming in *DeCasas*, then surely the caseloads here prevented the attorneys from affording their clients timely trials. In short, he posits the SVP team in this case was "shamefully understaffed."

To be sure, Sial testified that when he first joined the SVP team in 2013, each attorney had about 18 or 19 cases. His own caseload fluctuated between 18 and 23 cases over the next several years, until it was reduced to about 10 cases when the new attorneys joined the team. But he also testified that, typically, only five or six cases were on the trial track at any given time, and an attorney could reasonably try three or four cases each year. Although Sial recognized that he had to prioritize his cases on the trial track based on the age of the petition, whether the client had received a negative evaluation, and other criteria—which sometimes meant that other cases were scheduled to be tried ahead of Mix's—Sial never expressed that he was overwhelmed to the point of ineffectiveness, as in *DeCasas*.

Notably, both O'Brien and Sial testified that Sial never asked O'Brien to reassign Mix's case because he was overwhelmed. If he had, O'Brien testified, someone on the SVP team was available to try the case. O'Brien would have reassigned the case to whomever could bring it to trial the soonest. This is supported by the fact that in 2015, when Sial had several clients demanding to go to trial at the same time, two or three of his cases were reassigned. And in 2018, when Mix unequivocally asserted his speedy trial right, O'Brien promptly reassigned his case to Harry Gobrecht.

The record belies Mix's assertion that his attorneys, including Sial, did "basically nothing" to prepare his case for trial. While it is not clear how much progress, if any, Chris Williams, Pamela King, and Dave McClave made toward trial, Frank Loo retained a defense expert, interviewed one of the DSH evaluators, and arranged for an investigator to interview witnesses at Mix's request. Sial filed a successful motion to quash, reviewed several thousand pages of discovery, continued working with defense experts, and engaged investigators and social workers to work on a release plan. Both Loo and Sial affirmed they had regular contact with Mix, in person and over the phone.

Lastly, relying on *In re Butler* (2020) 55 Cal.App.5th 614 (*Butler*), Mix argues "it would be fundamentally unfair to hold [him] responsible" for the delays in his case. One month into the 13-year pretrial period in *Butler*, the defendant wrote to the trial court stating that "he acted upon the advice of his attorney to waive time and go into treatment" but if the court asked him " 'if that was what [he] really wanted . . . truthfully, it's not.' " (*Id.* at p. 629.) Nevertheless, his trial was set one-and-a-half years later, with no evidence that he was advised about his right to a timely trial or personally waived that right. (*Id.* at pp. 629–630, 635.) Over the next several years, his attorney

repeatedly continued trial. (*Id.* at pp. 630–631.) At one point, the defendant wrote to his attorney " 'requesting to be taken to trial as soon as possible' " and reiterating that he had " 'never given the Public Defender[']s Office permission to waive time on my behalf in this legal matter.' " (*Id.* at p. 630.) The attorney never informed the trial court about the letter or the defendant's assertion of his right. (*Ibid.*) This attorney, and subsequent appointed counsel, continued to postpone trial. (*Id.* at pp. 630–633.) Twelve years into the pretrial period, the defendant requested a *Marsden* hearing in which he asserted "the public defender's office had failed to represent him competently by declining to bring his case to trial and that he had never agreed to any continuances." (*Id.* at p. 633.) The court denied the *Marsden* motion, and the defendant filed a habeas corpus petition. (*Butler*, at p. 634.)

On that record, the *Butler* court discerned "abundant evidence to support the habeas corpus court's finding that [the defendant's] public defenders essentially ignored and disregarded his demands for a timely trial and his express direction that counsel was not authorized to waive time on his behalf." (55 Cal.App.5th at p. 658.) In addition to the "office's collective failure to convey [the defendant's] trial demands" and "its disregard of the express wishes of the client," the "relay race" of public defenders also failed to demand a probable cause hearing, consult any defense experts, or "come close to being ready for trial." (*Ibid.*) They also engaged in "piecemeal litigation seemingly without purpose other than to forestall trial." (*Ibid.*) Under those circumstances, the appellate court agreed with the superior court "that it would be fundamentally unfair to hold [the defendant] personally and solely accountable for the delays caused by his counsel," regardless of whether there was a systemic breakdown. (*Ibid.*)

This case is readily distinguishable. In each of his eight *Litmon* waivers, Mix specifically acknowledged that he understood his due process right to a speedy trial, and that by requesting postponement of his case, he was waiving that right. The record indicates that Mix signed these waivers after consulting with counsel. When Mix communicated his desire to go to trial in 2013, Loo promptly alerted the trial court. And when he reasserted that desire in October 2018, he was quickly given a *Marsden* hearing. There is no evidence in this case that the trial court or Mix's attorneys ignored him, or that his attorneys waived his speedy trial right against his express wishes.

In short, the record in this case confirms that Mix had several public defenders appointed to represent him, and at least some of them had hefty caseloads. But that is not enough to prove systemic breakdown. And there is otherwise no evidence identifying a systemic or institutional problem causing the delay in this case. Thus, the trial court did not abuse its discretion in analyzing this factor.

### ii. *The Prosecution*

"Because alleged SVPs have no duty to bring themselves to trial, the government has a responsibility to ensure the case is moving forward in a manner that is consistent with due process." (*Camacho*, *supra*, 15 Cal.5th at p. 388; see also *Barker*, *supra*, 407 U.S. at p. 527 ["A defendant has no duty to bring himself to trial; the State has that duty as well as the duty of insuring that the trial is consistent with due process" (fns. omitted).].)

The prosecution's "due process obligation in an SVPA proceeding cannot be defined with precision, as *Barker* recognized that a speedy trial analysis entails a careful weighing of the different factors and the circumstances of each case." (*Butler*, *supra*, 55 Cal.App.5th at p. 655.) But it is clear that due process requires the prosecution to "diligently prosecute

41

the case." (*Ibid*.) "This may entail stating on the record that it is prepared to go to trial, taking affirmative steps to set a trial date, promptly requesting clinical evaluations and records, and securing the attendance of witnesses in a timely manner." (*Ibid*.) "When faced with unwarranted delays or repeated continuances, 'diligent prosecution of an SVP petition may necessitate objecting to the delays, insisting upon trial deadlines, and making the trial court aware of the length of time since the filing of the SVP petition or other pertinent details from the record.' " (*Camacho*, *supra*, 15 Cal.5th at p. 388.)

Here, the record supports the trial court's implicit finding that the prosecution was not significantly responsible for the delays in this case, particularly when compared to the defense. There was only one change in prosecutors—from Maureen O'Connell to Daniel Ross—and apparently only one instance when the prosecution requested a continuance—when Ross had a personal matter arise in August 2016. Otherwise, the prosecution requested updated evaluations throughout the proceedings, and announced ready for trial in June 2019 when Mix pressed his right to a timely trial. Mix does not dispute these points on appeal.

The focus of his argument is that the prosecution failed to push his case forward. Although the prosecution could "have exhibited greater diligence in ensuring [Mix] was timely brought to trial"—for instance, by objecting to the defense's requests to continue trial—the prosecution's mere acquiescence in the defense's requests does not overcome the defense's responsibility for the delay. (*Camacho*, *supra*, 15 Cal.5th at p. 388.)

### iii. *The Trial Court*

"When a defense attorney requests more time to prepare for trial," the trial court is placed "in a difficult position." (*Williams*, *supra*, 58 Cal.4th at p. 250.) It "must balance a defendant's right to a speedy trial with his right

to competent counsel." (*Ibid.*) Nevertheless, the court " ' "has an affirmative constitutional obligation to bring the defendant to trial in a timely manner. And to that end, it is entirely appropriate for the court to set deadlines and to hold the parties strictly to those deadlines unless a continuance is justified by a concrete showing of good cause for the delay.[16] The trial judge is the captain of the ship; and it goes without saying that the ship will go in circles if the crew is running around the deck with no firm marching orders." ' " (*Camacho, supra*, 15 Cal.5th at pp. 388–389, citations omitted.)

Here, there is no evidence that court congestion prevented the parties from proceeding to trial. To the contrary, the record reflects that San Bernardino Superior Court has a dedicated courtroom for SVP cases, and was generally available for trial. Following the 2018 *Marsden* hearing, the court made clear that it expected trial to begin as soon as possible. It appears there were just two instances when the court delayed the proceedings due to its availability—a mere 11 days before the probable cause hearing, and a two-week period before the motion to dismiss. Again, Mix does not contend otherwise.

Mix faults the trial court for allowing the parties to continue the proceedings "with few, if any, formal findings of good cause for the delays." To be sure, the record shows that the parties generally agreed to continue

16    Effective January 1, 2020, the Legislature amended section 6603 to require a party seeking to continue trial to file and serve a written motion supported by "affidavits or declarations detailing specific facts showing that a continuance is necessary." (§ 6603, subd. (c), as amended by Stats. 2019, ch. 606, § 1.) The court must hold a hearing to determine whether good cause has been shown, and if so, it must state the facts justifying its finding on the record. (§ 6603, subd. (c)(4).) The amended statute specifies that " 'good cause' includes, but is not limited to, those cases in which the attorney assigned to the case has another trial or probable cause hearing in progress." (*Id.*, subd. (c)(8).)

status conferences and trial dates, and the court acquiesced in their joint requests without much inquiry. In that sense, the court probably could have done more to assess the status of the case, encourage the parties to set trial dates, and "carefully examine the propriety of continuing" trial dates once they were set. (*Camacho, supra*, 15 Cal.5th at p. 389.) But again, a trial court's shortcomings in urging a case to trial do not overcome the defense's responsibility in delaying the proceedings. (*Id.* at p. 390 ["while the court certainly could have done more to urge the case to trial and enforce deadlines, the responsibility for the delay rests primarily with the defense"]; see also *Williams, supra*, 58 Cal.4th at p. 251 [finding the trial court was not "directly responsible for the delay in this case" in granting defense counsel's requests for continuances].) Accordingly, the trial court did not err in implicitly finding it was not primarily responsible for the delays in this case.

c. *Assertion of the Right to a Speedy Trial*

A defendant who fails to demand a speedy trial does not forever waive that right. (*Barker, supra*, 407 U.S. at p. 528.) The defendant's assertion of, or failure to assert, the right is just one of the factors to be considered in the speedy trial analysis. (*Ibid.*) The defendant's assertion of their speedy trial right is entitled to "strong" evidentiary weight. (*Id.* at pp. 531–532.) On the other hand, "the failure to assert the right will make it difficult for a defendant to prove that [they were] denied a speedy trial." (*Id.* at p. 532.)

Analysis of this factor "does not hinge on ' "the number of times the accused acquiesced or objected; rather, the focus is on the surrounding circumstances, such as the timeliness, persistence, and sincerity of the objections, the reasons for the acquiescence, whether the accused was represented by counsel, the accused's pretrial conduct (as that conduct bears on the speedy trial right), and so forth. The totality of the accused's

44

responses to the delay is indicative of whether he or she actually wanted a speedy trial." ' " (*Camacho*, *supra*, 15 Cal.5th at p. 390, citations omitted.)

Here, Mix contends the trial court erred in failing to recognize that he "formally asserted his right to a speedy trial" when Loo filed the "trial memo" on October 4, 2013, and that he maintained his desire to go to trial "from when Sial first began to represent him through July 2017," even when he was signing *Litmon* waivers. He further faults the court for failing to give more weight to his assertion in the 2018 *Marsden* hearing.

For the reasons discussed above, the trial court's decision to give effect to Mix's *Litmon* waivers was reasonable and supported by the record. It goes without saying that during the periods of time in which Mix expressly waived his speedy trial right via *Litmon* waivers, he was not asserting that right.

Focusing on the trial court's construction of the intervening, nonwaived periods, Loo's "trial memo" fell within the April 17, 2013 to November 17, 2013 nonwaived period. In declining to recognize the trial memo as a break in the nonwaived period, we presume the court impliedly found the assertion to be equivocal or halfhearted. Such an implied finding is supported by substantial evidence. Loo filed the trial memo on October 4, 2013, and the minute order of the next status conference on November 8, 2013 states that "counsel for [Mix] informs [the] court that respondent is requesting trial." It further states, however, that Loo requested a continuance "to further discuss [the] matter with [his] client." The reason noted was "possible *Litmon* to be filed." At the next status conference on January 3, 2014, jury trial was set for November 10, 2014.[17] A few weeks after that conference, Mix requested a *Marsden* hearing, during which he admittedly did not demand a speedy trial. Immediately after the *Marsden* hearing, Mix signed a one-year *Litmon*

17    There are no reporter's transcripts for these hearings.

45

waiver to continue treatment.  Given these circumstances—where Mix's request for a "quick trial date" was seemingly abandoned and resulted in another one-year *Litmon* waiver—we do not fault the trial court for giving this assertion little weight.  (Cf. *People v. Bradley* (2020) 51 Cal.App.5th 32, 43 ["although defendant asserted his right to a speedy trial, he did not do so with great frequency or force"].)

The next nonwaived period lasted from June 4, 2016 until November 23, 2016.  During this time, Mix was represented by Sial, and trial was initially set for July 2016.  But by June 2016, the parties were still waiting for updated evaluations, and Ross had personal matters to attend to in August, so counsel agreed to continue trial to October 2016.  In the meantime, counsel litigated the motion to quash Ross's overbroad request for Mix's hospital records, and the new allegations of sexual abuse against Mix came to light.  Accordingly, in October 2016, trial was pushed to April 2017.

Mix admits he did not demand a speedy trial in court—via letter, phone, *Marsden* hearing, or otherwise—during this time.  Relying again on *Butler*, *supra*, 55 Cal.App.5th 614, he argues instead that he communicated to Sial that he wanted to go to trial, and this was enough to meaningfully assert his right.  But insofar as Mix was asking Sial to go to trial during this time, Sial was acting upon that request.  He was actively setting trial dates, anticipating updated evaluations, litigating discovery issues, and confronting newly discovered evidence.  That sets this case apart from *Butler*, where there was "ample evidence that [the defendant] asserted his right repeatedly throughout [the pretrial] period and was unequivocal that his public defenders were not authorized to waive time on his behalf, and yet his appointed counsel requested or acceded to over 50 continuances." (*Id*. at p. 650.)  Unlike appointed counsel in *Butler*, Sial was not ignoring Mix.

46

In this context, it was reasonable for the trial court to construe Mix's silence during this period as acquiescence in Sial's work.

That leaves the final nonwaived period, October 15, 2018 to the time the court ruled on the motion to dismiss. As noted, the trial court recognized that Mix "asserted his speedy trial right when he requested a *Marsden* motion in October of 2018." (Italics added.) It observed, however, that Mix agreed to postpone trial at the conclusion of the *Marsden* hearing. He initially agreed to wait to set trial dates until he completed his release plan, and when he decided *not* to complete that plan, he agreed to a June 2019 trial date. From then on, the delay was attributable to the speedy trial litigation. (Cf. *United States v. Loud Hawk* (1986) 474 U.S. 302, 316 ["In that limited class of cases where a pretrial appeal by the defendant is appropriate [citation], delays from such an appeal ordinarily will not weigh in favor of a defendant's speedy trial claims"].) The court properly considered the circumstances surrounding Mix's assertion of his speedy trial right in October 2018 and, in our view, reasonably determined the assertion did not merit strong weight.

### d. *Prejudice to the Defendant*

The final *Barker* factor is the prejudice to the defendant caused by the pretrial delay. In this context, prejudice "should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect." (*Barker*, *supra*, 407 U.S. at p. 532.) The high court has identified "three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." (*Ibid.*, fn. omitted.) "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." (*Ibid.*)

47

"In the SVP context, we consider the same interests, but acknowledge differences in how the interests arise." (*Camacho, supra*, 15 Cal.5th at p. 391.) With respect to the first two interests, it is clear that "[b]eing held in anticipation of an SVP trial, like pretrial detention in a jail, unquestionably entails a severe and oppressive restriction on liberty that may give rise to feelings of anxiety and concern." (*Id*. at p. 392.) Unlike pretrial criminal detention, however, alleged SVPs are confined in a state hospital where they can receive mental health treatment while they await trial. (*Id*. at p. 393.) Indeed, pretrial treatment can lead to the accused's pretrial release. (*Ibid*.)

Regarding the most serious interest—the possibility that the defense will be impaired—there is a presumption of trial prejudice that applies in criminal cases, but not SVP cases. (*Camacho, supra*, 15 Cal.5th at pp. 391–392.) Specifically, "in the criminal context, ' "affirmative proof of particularized prejudice" ' " is not required. (*Id*. at p. 392.) Because "defense witnesses may die, disappear, or lose their memory of the relevant events," and " 'time's erosion of exculpatory evidence and testimony "can rarely be shown," ' " the courts recognize that lengthy pretrial delay in criminal cases " 'presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify.' " (*Id*. at pp. 391–392.)

"There is little reason, however, to apply a presumption of trial prejudice in the SVP context. As previously noted, trial on a petition for commitment under the SVP Act aims to establish whether a person meets the definition of an SVP *at the time of trial*. This inquiry is categorically different from that of a criminal trial, where the issue is whether the defendant's past conduct constitutes guilt of a particular offense. In the SVP context, then, time ordinarily will not erase critical evidence for the defense, since the jury relies on recent expert evaluations to evaluate whether the individual

48

qualifies as an SVP at the time of trial." (*Camacho*, *supra*, 15 Cal.5th at p. 392.) "Severe prejudice to the alleged SVP's defense is less likely to result purely as a function of the passage of time; as a result, no presumption of prejudice applies in this context." (*Ibid.*)

Here, Mix made no attempt, in the trial court or on appeal, to explain how the delay impaired his ability to defend himself at trial. Nor is any such prejudice obvious. By the time of the motion to dismiss, both DSH evaluators maintained that he met the criteria for SVP commitment, but the defense expert, Dr. Fisher, had the opposite opinion. At trial, only one expert opined that Mix met the criteria, and two gave the opposite opinion. In that respect, his defense became stronger with the passage of time. There is no indication from Mix or the record that his trial would have been more favorable had it occurred earlier.

Mix's only argument on appeal is this: "A person who has not yet been committed as an SVP, cannot be released from custody. A person who has been committed as an SVP is potentially eligible for conditional release or for the opportunity to be released based upon a favorable annual report. The incentive to participate in treatment strengthens after commitment because there is no longer the concern that the statements made during the course of treatment will be used against the person in the initial commitment trial. Instead, active participation in treatment is the only way to be released other than by getting older, sicker, and/or dying. [¶] For these reasons, [Mix] contends the prejudice factor weighed slightly in his favor."

This argument, in the Attorney General's words, "puts the proverbial cart before the horse and is speculative." Mix fails to recognize, as the *Camacho* court did, that "[p]retrial treatment of the underlying mental disorder that caused the state to seek commitment in the first place may

49

ultimately facilitate the individual's release before trial." (*Camacho*, *supra*, 15 Cal.5th at p. 393.) Moreover, Mix makes no claim or citation to the record that he, in fact, refrained from fully participating in treatment out of fear that his words would be used against him. His argument also assumes his eventual commitment; at the time of the motion to dismiss, that was not a given. In failing to demonstrate prejudice, especially the "most serious" form thereof, Mix fails to show the trial court erred in assessing this factor.

**B.** *Mix Failed to Preserve Any Claim That The Trial Court Should Have Recused Itself From Hearing Mix's Motion to Dismiss*

Mix relatedly contends that his right to due process was violated because Judge Balderrama did not recuse himself from hearing the motion to dismiss. He argues that the judge could not be an impartial decisionmaker insofar as the motion alleged that the trial court bore some responsibility for the pretrial delay in this case.

Mix has forfeited this argument by failing to raise it below. "We have allowed a defendant who objected to a judge's participation in the proceedings and merely failed to pursue the statutory appellate remedy under Code of Civil Procedure section 170.3, to raise on appeal a narrow due process claim. But a defendant who *never* objected to the judge may not do so." (*People v. Johnson* (2015) 60 Cal.4th 966, 979 (*Johnson*), citations omitted.)

Anticipating forfeiture, Mix alternatively claims that appointed counsel Victor Marshall rendered ineffective assistance in failing to object to Judge Balderrama hearing the motion to dismiss. "When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that,

50

but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

"When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. . . . On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Mai*, *supra*, 57 Cal.4th at p. 1009.)

"Deciding whether to object to a judge is inherently tactical. ' "There are, no doubt, an infinite number of reasons why counsel would not avail themselves of the opportunity to disqualify a judge. The failure to do so is within the competence of counsel, and does not show ineffective counsel." ' " (*Johnson*, *supra*, 60 Cal.4th at p. 980.) Indeed, the record in this case offers multiple reasons why Marshall might have been comfortable with Judge Balderrama deciding the motion. For instance, the motion required the decisionmaker to understand the entire procedural history of the case, and familiarity with SVP proceedings was surely helpful in understanding and contextualizing that history. The record makes clear that San Bernardino has one courtroom dedicated to SVP cases, and Judge Balderrama had been assigned to that courtroom—and to this case—since 2014. Accordingly, Marshall could have very reasonably decided that Judge Balderrama was best suited to decide the motion. Moreover, as the person most familiar with the motion and someone with extensive experience in that courtroom,

51

Marshall could have been satisfied that Judge Balderrama would be fair. We have no basis to second-guess his judgment. (*Ibid*.)

Finally, for the reasons explained above, even if it could be argued that the trial court bore *some* responsibility for the pretrial delay, it was not *primarily* responsible. Accordingly, we discern no reasonable probability that the motion to dismiss would have been granted had it been heard by another judge.

## C. *The Trial Court Reasonably Denied Mix's* Marsden *Motions*

Mix lastly argues the trial court abused its discretion in denying four of his *Marsden* motions to replace appointed counsel: his March 2014 motion to replace DPD Frank Loo, as well as his January, February, and April 2023 motions to replace his final bar panel attorney Mustafa Abdul-Rahman. The thrust of Mix's argument with respect to all four motions is that the trial court inadequately followed up on his complaints.

### 1. Marsden *Motions Generally*

Individuals facing SVP petitions have a statutory right to effective assistance of counsel (see § 6603, subd. (a)) and a due process right to a *Marsden* hearing. (*People v. Carter* (2024) 15 Cal.5th 1092, 1099 (*Carter*).)

"When a defendant seeks new counsel on the basis that his appointed counsel is providing inadequate representation—i.e., makes what is commonly called a *Marsden* motion [(*Marsden, supra*, (1970) 2 Cal.3d 118)]— the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance. A defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result. Substitution of counsel lies

within the court's discretion. The court does not abuse its discretion in denying the motion unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel." (*People v. Smith* (2003) 30 Cal.4th 581, 604 (*Smith*).)

2. *Frank Loo*

a. *Additional Background*

As discussed in detail above, the fourth attorney appointed to represent Mix (excluding those who occasionally made special appearances on his behalf) was DPD Frank Loo. Loo was appointed sometime in the Fall of 2013. In January 2014, Mix sent a written request for a *Marsden* hearing to the trial court. He specifically asked for an attorney from the bar panel, as opposed to the public defender's office.

The motion was heard in March 2014. In the closed courtroom, the court encouraged Mix to speak freely. Mix expressed concern that Loo was new to SVP cases, that he would not call certain witnesses Mix believed should testify in his defense, and that he was his "fifth lawyer in less than three years" which meant he had to "start all over again." Upon confirming Mix had no other complaints, the court invited Loo to respond.

Loo said that although he had only been handling SVP cases since Fall 2013, he had significant experience in civil and criminal cases, including experience with other forms of civil commitment proceedings. Loo also recounted the work he had done on Mix's case to date. He had visited Mix three times, phoned him six times, had an investigator interview the witnesses Mix was interested in, briefly spoke with a DSH evaluator in this case, and retained a defense expert who had already visited Mix. As to the witnesses, Loo determined their testimony was not "particularly helpful" to the defense because they could not say that Mix did not meet the SVP

53

criteria. The court asked whether Mix had any further comments, and he did not.

The trial court denied the *Marsden* motion, finding that Loo had "properly represented" Mix, noting that he "followed up on [his] request regarding those witnesses" and reasonably determined "[t]hey may not be exactly good expert witnesses as far as addressing your diagnosis." The court believed that Loo would "continue to properly represent" Mix.

b. *No Abuse of Discretion*

Mix argues the trial court erred in conducting his *Marsden* hearing because it "made no inquiries with respect to the high rate of attorney turnover and made relatively useless inquiries about Loo's competency and inexperience as an SVP attorney." At the same time, he recognizes that "Loo probably was not the right person to address [his] concern about the high rate of turnover" and "that all attorneys who represent SVPs have to do so for the first time at some point."

In our view, the trial court properly executed its duties in a *Marsden* hearing. The record shows the court "gave [Mix] full opportunity to air all of his complaints, and counsel to respond to them." (*Smith, supra*, 30 Cal.4th at p. 606; see also *People v. Abilez* (2007) 41 Cal.4th 472, 488 (*Abilez*) [defendant "fails to establish that the trial court's inquiry into his complaint was deficient" where the "record demonstrates the court allowed defendant to explain the reasons for his dissatisfaction with counsel and permitted counsel to respond"].) As Mix seems to realize, his complaints that Loo was "his fifth attorney in less than three years" and that Loo was new to SVP cases were not issues that Loo could remedy. They were merely observations about the state of the proceedings.

In the end, Mix appears to contend the trial court should have divined from his complaints that he was alleging a systemic breakdown in the public defender system and taken the initiative to "obtain input" from the supervisor of the SVP team. We do not fault the trial court for failing to interpret the tea leaves in this manner. *Carter, supra*, 15 Cal.5th 1092, on which Mix relies, is distinguishable from this case.

In *Carter*, after waiting 12 years to go to trial on an SVP petition, the defendant sought to enforce his due process right to a timely trial by filing a pro se motion to dismiss. (*Carter, supra*,15 Cal.5th at pp. 1095–1096.) At the same time, he filed a *Marsden* motion to replace the public defender's office and his deputy public defender as his counsel "because he believed the office would be disqualified from litigating the motion to dismiss on his behalf." (*Id*. at p. 1095.) In a hearing, the defendant elaborated that there had been multiple delays not at his request, and that he had rarely heard from his previous attorney. At the same time, he acknowledged that his current attorney communicated well and was doing everything she could to prepare for trial. (*Id*. at p. 1096.) In response, that attorney explained they had an unusually difficult time receiving updated evaluations, but they were now ready for trial. (*Ibid*.) She also expressed that she did not think she could pursue the motion to dismiss, insofar as she would have to argue she breached her ethical duties to her client in failing to pursue a timely trial, which she felt was not true. (*Id*. at p. 1097.) The trial court ultimately denied the *Marsden* motion, finding counsel was diligently trying to push the case forward, and did not rule on the motion to dismiss. (*Ibid*.) Instead, the court instructed the defendant to continue litigating the motion to dismiss in pro se, if he chose to do so. (*Ibid*.)

On review, the Supreme Court held that "the trial court conducted an insufficient *Marsden* inquiry and erred in instructing [the defendant] to file his motion to dismiss pro se." (*Carter*, *supra*, 15 Cal.5th at p. 1095.) More specifically, the Supreme Court held the trial court should have inquired into whether the defendant's current attorney "had any conflict that would have prevented her from litigating" the motion to dismiss. (*Id.* at p. 1102.) As the *Carter* court reasoned, the defendant raised several points that could support dismissal and that have nothing to do with current counsel's performance, including delays caused by previous counsel, problems with the hospital, and the trial court's shortcomings in moving the case along. (*Ibid.*) In other words, "[h]aving both motions before it, the trial court should have considered [the] *Marsden* motion in the context of [the] proposed motion to dismiss." (*Id.* at p. 1101.) The *Carter* court issued a limited remand for the trial court to conduct another *Marsden* hearing to determine whether a conflict of interest would prevent the public defender's office from litigating the motion to dismiss, and in turn, whether the public defender's office or alternate counsel should evaluate and litigate the motion to dismiss. (*Id.* at p. 1104.)

Here, there was no basis to trigger a conflict of interest inquiry. Mix did not file a motion to dismiss along with his request for a *Marsden* hearing. And he admittedly did not raise the speedy trial issue in the hearing. Although he complained about the number of attorneys that had been appointed to represent him, as discussed above, this is insufficient to establish a systemic breakdown in the public defender system. Considering the context of the hearing as a whole, the trial court fairly understood Mix to be expressing concern about the lack of progress in the case and Loo's ability to prepare for trial. In light of Loo's recitation of the work he had completed

to date—which, despite his newness to SVP cases, was more than previous counsel had achieved—the court was reasonably satisfied in his effectiveness.

### 3. *Mustafa Abdul-Rahman*

#### a. *Additional Background*

Several months after the trial court denied the motion to dismiss, and while the writ petition was pending, Victor Marshall withdrew as counsel due to medical reasons. The court then appointed James Crawford. Crawford represented Mix for about one year until the court relieved him, apparently due to irreconcilable differences and a breakdown in the attorney-client relationship. The court then appointed Early Hawkins, who similarly represented Mix for about one year until he requested to be relieved as counsel due to a conflict with Mix. In March 2022, the court appointed Mustafa Abdul-Rahman, who ultimately took Mix's case to trial.

On January 4, 2023, the parties appeared for a status conference and Abdul-Rahman requested to continue trial from February 6 to February 27, 2023. He also requested that Mix be transported to local custody so they could prepare for trial. Mix, who was present via phone, requested a *Marsden* hearing.

In the closed courtroom, Mix said that he had not heard from Abdul-Rahman since August. He was concerned that Abdul-Rahman had not interviewed certain witnesses or investigated the "severe hearsay issues" and "delay issues" in his case. Mix felt these things needed to be done before trial. The trial court (Judge Kawika Smith) asked if there was anything else Mix wanted to say. He said, "I really don't believe we're ready to go to trial." The court then invited Abdul-Rahman to respond.

Abdul-Rahman explained that he offered to visit Mix in person, but Mix preferred to talk over the phone. They spoke about his case several times in

depth. He left Mix a message in December and never heard back. He had contacted a defense expert that Mix was interested in, and recently followed up with them after the holidays. He researched the hearsay issues and was prepared to raise them at trial. As to the delay issues, he explained to Mix that "those issues happened prior to" his appointment and were preserved for appeal. He agreed they were not quite ready for trial; that is why he sought the continuance and Mix's transfer to local custody.

The court asked again whether there was anything else Mix wanted to add. Mix responded that he did not receive the December message and did not want to be transported to county jail.

The court then denied the *Marsden* motion, discerning no breakdown in the attorney-client relationship. The court found that Abdul-Rahman had been "diligent in preparing this case to the best of his ability, given his other trial schedule," that he anticipated being ready for trial in February, and that he would continue to communicate with Mix.

On February 14, 2023, Abdul-Rahman asked to begin jury selection on March 13 and then resume trial on April 5 in order to accommodate his trial schedule. Mix then requested another *Marsden* hearing so he could read a letter he wrote into the record.

In the closed courtroom, Mix enumerated several topics he brought to Abdul-Rahman's attention that had not been addressed. First, he recounted that his probable cause hearing was postponed for five months "without [his] knowledge" and without any time waivers which, in his view, warranted dismissal of his case. Second, he noted that the DSH evaluators' reports were "filled with hearsay." Third, he emphasized that he had "been screaming to go to trial ever since" the case began and he never wanted to waive time but his attorneys "asked [him] to waive." Mix believed he had "a new *Vasquez*

58

hearing based on" the fact that he had not "waived time since 2018, and here it is 2023." Fourth, he asked Abdul-Rahman "to speak to people concerning this case," including two experts and several professionals involved in his mental health treatment. Fifth, he believed he had "a *Butler* motion" which he described as a "motion to dismiss based on [the prosecution's] inability to move this case forward."

Abdul-Rahman responded that he had advised Mix "about his rights with respect to the delay of probable cause hearing, as well as the *Vasquez* timeliness issue." He had spoken to some of the individuals that Mix had suggested, but not all of them yet. Abdul-Rahman pointed out that although the case was more than 10 years old, he had only been involved for about one year. He understood that Mix wanted to go to trial right away. But given the age of the case, it was taking some time to review all the records in the case. And given the high stakes, he wanted to make sure he was prepared for trial. Abdul-Rahman affirmed that "all of Mr. Mix's issues shall be addressed" and he would be ready for trial by March 13, 2023, as requested.

The court asked whether there was anything else Mix wanted to tell the court. He reiterated he wanted "these things addressed before trial" or else he would not "have an appeal on these things."

The court denied the motion, finding Abdul-Rahman was providing Mix with appropriate representation. The court was sure he would "file whatever motions he sees as necessary and legally appropriate."

Jury selection began on March 13, 2023 as planned and concluded on March 17. Trial resumed on April 11, 2023. Testimony was scheduled to begin that day, but there were issues transporting Mix from Coalinga to the courthouse, including a medical issue. The court read the jurors preliminary

59

instructions, and then ordered them to return on April 17. On that date, opening statements and testimony began.

In the meantime, Mix filed a civil lawsuit against Abdul-Rahman, essentially alleging that he rendered ineffective assistance of counsel and violated professional ethics and state bar rules in refusing to file motions, retain experts, consult his treatment team, or otherwise "plan a defense strategy" for Mix. The lawsuit prompted yet another *Marsden* hearing on April 18, 2023.

In that closed hearing, the court asked Mix to elaborate on the allegations in his complaint. Mix explained that he asked Abdul-Rahman to speak with his treatment team and call them to testify at trial. There were "several motions that could have been heard" but which Abdul-Rahman did not file, including with respect to the hearsay and delay issues. Mix conceded Abdul-Rahman was going to call an expert on his behalf. As to his allegation that Abdul-Rahman did not have a defense strategy, Mix asserted "this [was] his first SVP case" and "his reasoning for not wanting to call the people at the hospital, just doesn't make sense to me." On the latter point, he reiterated that "there's a long list of people" on his treatment team "who would come and testify on [his] behalf."

The court then invited Abdul-Rahman to respond to these points. He acknowledged that he did not plan to call Mix's treatment team to testify at trial. He made "a judgment call" to not call them because he was concerned that they would be "unpredictable on the stand." Instead, his "strategy was to rely on the treatment notes as well as the" defense expert witnesses "to opine on how well" Mix was doing in treatment.

Abdul-Rahman also conceded he had not filed any motions in the case yet. He explained that Mix asked him to file a motion challenging hearsay

60

testimony elicited at his probable cause hearing based on *People v. Sanchez* (2016) 63 Cal.4th 665. He did not think that *Sanchez* applied retroactively to the probable cause hearing, although he was open to researching the issue further. He also declined to file a motion to dismiss based on delay because "that issue had already been litigated."

Upon further questioning by the court, Mix admitted that despite how long he had been at Coalinga, he had not yet completed the sex offender treatment program, which tended to substantiate Abdul-Rahman's concern that the treatment team would give unhelpful testimony at trial. Mix added that even though the delay issue was litigated before, he had "new delay issues that should be addressed."

Abdul-Rahman then advised the court that he did not think he could continue to represent Mix in light of the civil suit. As a practical matter, his attention would be divided between the SVP trial and defending himself in the civil suit. Speaking candidly, he admitted he was "not particularly happy about" the allegations against him and he "had a hard time concentrating on" the SVP case knowing that Mix was suing him.

Back in open court, the court denied the *Marsden* motion. Relying on *People v. Horton* (1995) 11 Cal.4th 1068 and other authorities, the court determined that it did not need to relieve Abdul-Rahman because there was no actual conflict of interest. As the court reasoned, the only potential conflict was the civil lawsuit, but it did not create a true conflict because the issues raised were "essentially the same issues that we have dealt with in" earlier *Marsden* hearings. In any event, the court exercised its discretion under Code of Civil Procedure section 187 to dismiss Mix's civil lawsuit without prejudice, on grounds that the issues raised "may be premature," but even if they were ripe, they served "as a distraction to the conduct of"

the SVP trial. The court also found Abdul-Rahman's explanations for his strategic choices in this case to be acceptable, and that he had been zealously representing Mix.

b. *No Abuse of Discretion*

Mix similarly claims that the trial court "did not make the necessary full inquiries or require Abdul-Rahman to address all of [his] complaints." For example, he argues the court should have "nailed down" every time Abdul-Rahman contacted him, "made detailed inquiries about Abdul-Rahman's investigation and contacts with perspective witnesses," and asked which records he had reviewed and which he had not. But the court's duty in a *Marsden* hearing is not so tedious and invasive. As noted above, the court satisfies its duty by giving the defendant a "full opportunity to air all of his complaints," and counsel an opportunity to respond. (*Smith*, *supra*, 30 Cal.4th at p. 606; see also *Abilez*, *supra*, 41 Cal.4th at p. 488.) The court fully satisfied its duty in each of the *Marsden* hearings at issue here.

Mix further contends the court abused its discretion in denying the *Marsden* motions because Abdul-Rahman's responses revealed he did not adequately investigate the defense. He specifically argues counsel failed to: interview the witnesses he wanted to testify at trial; evaluate the possibility of moving for a new probable hearing based on hearsay issues; consider filing a renewed motion to dismiss based on a violation of his speedy trial rights; and review his records in a timely fashion. We disagree.

Deciding which witnesses to call at trial is a matter of tactics, and tactical disagreements, by themselves, are "insufficient to compel discharge of appointed counsel." (*People v. Cole* (2004) 33 Cal.4th 1158, 1192.) Moreover, since Mix had not completed the sex offender treatment program in all of his years at Atascadero and Coalinga, Abdul-Rahman soundly decided to rely on

a combination of the hospitals' treatment notes and testimony from experienced expert witnesses, rather than the unpredictable testimony of the treatment team.

With respect to the hearsay issue, Abdul-Rahman explained that he was not sure the law would support a viable motion for a new probable cause hearing based on alleged *Sanchez* error, but he was prepared to argue for the exclusion of inadmissible hearsay evidence at trial. Even assuming the law supported such a motion,[18] the decision whether to file a motion is tactical, and it seems reasonable for counsel forgo the motion for a new probable cause hearing in order to focus on trial. As Mix concedes in his brief, "it is difficult to determine whether a new probable cause hearing would have benefitted [Mix] or simply unnecessarily delayed his case further."

As to the delay issue, Abdul-Rahman repeatedly confirmed that he investigated the matter and determined that the issue had already been litigated. He discussed the issue with Mix and advised him about his rights, including his appellate rights. Implicit in Abdul-Rahman's comments is that he discerned no *new* grounds to file a renewed motion to dismiss. Again, the decision whether to file a pretrial motion is tactical, and disagreements over tactical decisions do not compel the replacement of counsel. Mix urges us to draw a contrary inference. He suggests that James Crawford and Early Hawkins were relieved from their appointments because they were unable to give Mix a timely trial. But the record more vaguely reflects that these attorneys were relieved due to irreconcilable differences with Mix.

---

18    In *Walker v. Superior Court* (2021) 12 Cal.5th 177, the Supreme Court held that hearsay concerning nonpredicate offenses in evaluation reports was inadmissible in SVPA probable cause hearings. (*Id*. at p. 209.)

To the extent Mix complains that Abdul-Rahman had not completed reviewing his records by February 2023, the trial court accepted counsel's assurance that he would be prepared for trial by March 2023. Mix points to nothing in the record suggesting Abdul-Rahman did not, in fact, finish reviewing the necessary materials before testimony began in April.

Finally, Mix faults the trial court for keeping Abdul-Rahman on the case after he "made it clear he was not able to devote proper effort to [his] case given the existence of the" civil lawsuit. But Mix makes no attempt to explain how that concern was not resolved when the trial court exercised its discretion to dismiss the civil lawsuit.

## DISPOSITION

The commitment order is affirmed.


DATO, J.

WE CONCUR:


IRION, Acting P. J.


BUCHANAN, J.